UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 1:13-cr-00021-JAW |
| | ) | |
| RANDOLPH LEO GAMACHE, | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION
RE: MOTION TO SUPPRESS
(ECF NO. 19)**

Randolph Gamache, charged with violating federal law because of his alleged possession of an unregistered shotgun having a barrel of less than 18 inches in length, moves to suppress the shotgun seized from his residence. He also seeks suppression of statements he made to the police on July 30, 2012, July 31, 2012, and September 14, 2012. Gamache has not filed an affidavit relating to the facts and circumstances of either the seizure or the statements, has not filed a reply to the Government's version of events, and has not requested an evidentiary hearing.[1] Gamache's theory for suppression hinges on the notion that the officers' arrival at his residence to serve a temporary order for protection from abuse gave rise to an inherently custodial scenario that tainted the subsequent events, rendering any consent to the seizure of the weapon or statements made after the seizure involuntary and inadmissible as a matter of law. Finding no infirmity in the officers' conduct that would warrant suppression, I now recommend that the court deny the motion to suppress.

---

[1] The facts appear largely undisputed. Gamache's counsel sets them forth from Gamache's perspective in thirteen unsworn paragraphs, all of which I have incorporated into my proposed findings of fact, with the exception of paragraph 6, which relates that the officers met Gamache on the sidewalk and the encounter then moved into his apartment. The officers' affidavits do not describe a sidewalk encounter and I have relied on those affidavits in formulating the proposed findings of fact. However, even if the encounter began on the sidewalk, that fact standing alone, as set forth in paragraph 6, does not change my view of the outcome of this motion.

**Proposed Findings of Fact**

On July 30, 2012, Randy Gamache was living in an apartment in Orono, Maine. His ex-wife, Anne-Marie Gamache, brought an ex parte complaint against him in the Bangor District Court on July 30, alleging abuse and seeking the court's protection. (Complaint for Protection from Abuse, ECF No. 21-3.) The resulting ex parte orders, which were granted in response to her complaint without advance notice to Gamache or an opportunity for a hearing, prohibited Gamache from possessing any firearm and required him to relinquish any firearm in his possession to a law enforcement officer. (Temporary Order of Protection from Abuse and Notice of Hearing, ECF No. 21-1; Order Prohibiting Possession and Requiring Relinquishment of Firearms and Weapons, ECF No. 21-2.) The orders informed Gamache that possession of a firearm while the order for protection remained in effect would be punishable as a Class D crime.

Scott Scripture,[2] a twenty-five year veteran officer at the Orono Police Department, served Gamache both the temporary protection from abuse order and the order requiring relinquishment of firearms at Gamache's apartment in Orono on July 30. Scripture was accompanied by Ed Leskey, an Orono patrol officer. Both officers were armed and in full police uniform. Upon their arrival Gamache opened the front door of his apartment and motioned for the officers to enter. They entered the apartment, informing Gamache that they had some paperwork for him. Scripture read the eight paragraphs on the temporary order for protection from abuse checked off by the Maine District Court Judge, including the paragraph prohibiting the possession of firearms, but he did not warn Gamache about the potential criminal sanctions or advise Gamache that if he retained any firearms he could be in contempt of court.

Scripture told Gamache that if he wanted to contest the order he would have to go to a

---

[2] The facts related to Scripture and Leskey's visit to Gamache's premises are drawn from the Declaration of Scott Scripture. (Gov't Ex. 4, ECF No. 21-4.)

court hearing on August 15.  Scripture gave Gamache an opportunity to read the paperwork himself to make sure he understood.  Gamache then signed the court copy, acknowledging service, and was provided with a copy for his own records.

Scripture then informed Gamache of the order requiring him to relinquish any firearms and, consequently, was called upon to ask Gamache if he had any firearms in the apartment.  Scripture's tone during this time was conversational; he did not raise his voice, brandish his weapon, or otherwise touch or threaten Gamache.  In response to Scripture's question Gamache pointed to his living room wall where two shotguns were displayed in plain view.  Even if Gamache had not pointed to the weapons, Scripture would have inevitably seen them from his vantage point.  Neither Leskey nor Scripture searched the apartment or Gamache's person.  Leskey removed the two shotguns from the living room wall and then Gamache gave the officers two additional powder guns.  Scripture then asked Gamache if he had any additional guns and informed him that he could be charged with a criminal offense if he failed to turn over any additional firearms in his possession.  Gamache denied possession of any additional firearms.

Prior to July 30, 2012, neither Leskey nor Scripture had any knowledge of Gamache's possession of any firearms.  The purpose of their visit was not to obtain evidence for a criminal prosecution or to compel Gamache to make any incriminating statements.  The officers' visit lasted approximately forty minutes.

On July 31, 2012, and again on September 14, 2012, Robert Jordan,[3] a Penobscot County detective designated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives as an officer on the Eastern Maine Violent Crime Task Force, conducted follow-up interviews at Gamache's Orono apartment.  On both occasions Jordan was accompanied by Derek Dinsmore, a detective

---

[3] The facts related to Jordan and Dinsmore's visits to Gamache's premises are drawn from the Declaration of Robert Jordan. (Gov't Ex. 5, ECF No. 21-5.)

at the Orono Police Department.  These discussions concerned Gamache's possession of the unregistered sawed-off shotgun.  Jordan advised Gamache that he was not under arrest and would not be placed under arrest.  The atmosphere was relaxed and the interview was conducted in a conversational tone, without intimidation or pressure.  Gamache did not appear to be under pressure or duress based on his demeanor.  He was neither questioned about nor advised as to any course of action surrounding the orders served on him on July 30.  The grand jury indicted Gamache on federal charges in connection with the sawed-off shotgun on February 7, 2013.

## Discussion

Gamache maintains the unregistered, short-barreled shotgun he turned over to the officers must be suppressed because it was seized without a warrant in violation of his Fourth Amendment rights. (Motion at 3.)  Gamache acknowledges that a valid consent to a search or seizure vitiates the constitutional requirement of a warrant prior to seizure. (Mot. at 4, citing Schneckcloth v. Bustamonte, 412 U.S. 218, 219 (1973).)  However, Gamache maintains that because he was compelled to comply with the court order, he faced "official coercion" and the apparent consent he gave was not, in fact, voluntarily given. (Id. at 4.)  Gamache likewise contends that the statements he made on July 31, 2012, were involuntarily procured in violation of the Fifth Amendment because they were the product of official coercion in terms of "the coercive power of the written court orders and police directives designed to enforce the directives." (Id. at 5.)  By logical extension, Gamache maintains the statements made on July 31 and September 14 were "fruit of the poisonous tree" and should be suppressed under the doctrine set forth in Wong Sun v. United States, 371 U.S. 471 (1963). (Id. at 8.)

### *The Fourth Amendment Claim*

The officers' arrival at Gamache's door for the purpose of serving him with court orders

4

did not violate the Fourth Amendment. The purpose of the Fourth Amendment "is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of the individuals.'" United States v. Mendenhall, 446 U.S. 544, 553-54 (1980) (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976)). The fact that the officers are readily identifiable as police officers engaged in some type of official business does not "convert the encounter into a seizure requiring some level of objective justification." Florida v. Royer, 460 U.S. 491 (1983) (approaching an individual on the street and asking if he will answer some questions does not violate the Fourth Amendment). Of course, Martinez-Fuerte, Mendenhall, and Royer did not involve entries into homes. A warrantless entry into another's home, absent consent or another constitutionally recognized exception, is per se unreasonable. Payton v. New York, 445 U.S. 573 (1980) (holding unconstitutional a state statute authorizing warrantless and nonconsensual entry into homes to make routine felony arrests).

"The fundamental inquiry under the Fourth Amendment is whether a particular search or search procedure is 'reasonable' in the circumstances." McCabe v. Life-Line Ambulance Service, Inc., 77 F.3d 540, 544 (1st Cir. 1996) (observing that the Fourth Amendment applies to civil proceedings as well as criminal and holding that a warrantless, nonconsensual entry to the home to enforce an involuntary commitment order was reasonable). In the present case the officers did have an objectively reasonable purpose in approaching Gamache, either on the sidewalk or by knocking at his apartment door. Their purpose did not involve a criminal investigation and was not based upon probable cause, making their ability to obtain a warrant to search the premises for firearms impracticable. They were obligated to serve Gamache with the court order and notify him of his duty to relinquish any firearms in his possession in the interest

5

of public safety and the protection of a former spouse from possible violence.  Although they were not entitled to force their way into the residence to fulfill their duty, nothing prohibited them from entering on Gamache's invitation.

"A residential search pursuant to an established warrantless search *procedure* may be reasonable if conducted in furtherance of an important administrative or regulatory purpose, or 'special need,' which would be undermined systemically by an impracticable warrant or probable-cause requirement. Id. at 545 (citing Griffin v. Wisconsin, 483 U.S. 868, 873 (1987) ("[W]e have permitted exceptions when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.") (internal quotation marks and citation omitted).  Although I doubt that the "special need" exception could be invoked on these facts, I need not reach that issue because as a factual matter no forced entry or search of the residential premises took place. The officers were admitted to the residence with Gamache's voluntary consent when he was told that the officers had some paperwork for him. There was no coercion involving the initial entry into the apartment and no "search" of the apartment ever took place.  After the officers explained in detail the requirements of the two court orders, Gamache voluntarily relinquished the firearms in question.[4]

Alternatively, the government argues that the seizure of the firearms was lawful because once the officers were invited inside the apartment, the two firearms were in plain view. (Response at 5 n.7.)  According to precedent, the warrantless seizure of the shotgun would have been lawful under the plain view doctrine as long as (1) the officers lawfully reached the vantage point from which they saw the object in plain view;  (2) probable cause existed to support the seizure of the object;  and (3) the officers had a right of access to the object.  United States v.

---

[4] In fact, Gamache is proposing an impracticable "no-entry" rule that would prohibit officers from accepting invitations into premises whenever they are serving orders of this kind.  The Fourth Amendment does not support such a rule because there is nothing unreasonable about entering a residence on invitation.

6

Sanchez, 612 F.3d 1, 4-5 (1st Cir. 2010).  The officers clearly met the first and third requirements; they were lawfully in the apartment pursuant to a valid consent to their entry and they had a court order giving them access to the firearm itself.  As for the second requirement, the officers do not aver that they immediately recognized the shotgun as a weapon whose possession was unlawful in the absence of the civil order to relinquish, but they did have cause to know that Gamache was under a court order to relinquish the weapon.  Had Gamache refused to turn over his weapons, then probable cause would have arisen.

In the end, Gamache was not obligated to allow the police officers into his private residence in order to effectuate service of the orders, but nothing the officers did or said during the initial encounter informing Gamache of their purpose served to make the encounter coercive from a reasonable person's perspective.  The undisputed evidence is that Gamache motioned for the officers to enter his apartment after they announced their general purpose in being there.  Once the officers were allowed into the residence, the firearms were visible to the officers, and if Gamache had not voluntarily relinquished them, the officers would have had probable cause to believe that Gamache was in violation of a Class D state law crime of violation of the protection order.  They could have secured the premises and obtained a warrant to seize the firearms or, arguably, seized them under the plain view doctrine at the point in time when Gamache refused to relinquish them and they developed probable cause to believe an offense was being committed.  But as it happened, Gamache voluntarily invited the officers into his home and turned over, without objection, both the weapons in plain view and two additional "powder" weapons.  There was nothing that occurred during this consensual encounter that violated any Fourth Amendment principles in terms of an unreasonable search or seizure.

*The Fifth Amendment Claim*

Gamache's Fifth Amendment claim appears to have two components. First he argues that the July 30 interview, as well as the two later visits, were the equivalent of custodial interrogations and that therefore he should have been advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). (Motion at 5-6.) Gamache's second argument is that everything he said and did on July 30, 2012, including the nontestimonial[5] act of relinquishing the firearms to the officers, was "in response to the coercive power of the written court orders and police directives designed to enforce the directives" and thus were involuntary acts. (Motion at 5.) Under this theory of suppression the July 31 and September 14 statements should be suppressed as "fruit of the poisonous tree" as those statements flowed from the relinquishment of the firearm, ostensibly in violation of the Fourth Amendment. (Id. at 8.) In Wong Sun v. United States, 371 U.S. 471 (1963), the Supreme Court held that evidence and witnesses discovered as a result of a search in violation of the Fourth Amendment must be excluded from evidence. The Wong Sun doctrine also applies when the fruit of the Fourth Amendment violation is a confession. Brown v. Illinois, 422 U.S. 590, 602 (1975). As I do not find that there was any Fourth Amendment violation on these facts, the Wong Sun doctrine does not apply to any of the statements.

"In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment . . . commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'" Bram v. United States, 168 U.S. 532, 542 (1897). In Miranda, the Supreme Court established "rules of police procedure applicable to 'custodial interrogation.'"

---

[5] The defendant's argument about the coercive power of the court orders and police directives incorporates and assumes an underlying Fourth Amendment violation in the seizure of the firearm. I have rejected that basic contention.

8

Oregon v. Mathiason, 429 U.S. 492, 494 (1977). It held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444. From there, the Court prescribed the classic "Miranda warning," requiring that any custodial interrogation be preceded with cautionary advice that the suspect has "a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. The Miranda warning was deemed necessary to combat the "'compelling pressures' inherent in custodial police interrogation" and safeguard the Fifth Amendment. Dickerson v. United States, 530 U.S. 428, 440 (2000) (quoting Miranda, 384 U.S. at 467). However, for Miranda warnings to be required there must be a custodial scenario. Non-custodial questioning does not require a warning. Mathiason, 429 U.S. at 495; United States v. Quinn, 815 F.2d 153, 160 (1st Cir. 1987). Thus, for Gamache's motion to succeed on the basis of a Miranda violation, it must be apparent that he was in custody at the time of his unwarned statements. United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011).

For a suspect to be in custody, he must be subject to either formal arrest or an equivalent restraint on his freedom of movement. California v. Beheler, 463 U.S. 1121, 1125 (1983); Mathiason, 429 U.S. at 495. The restraint imposed on a suspect's movement need not be physical. Custody may arise where the suspect is "otherwise deprived of his freedom of action in any significant way," including through the imposition of psychological pressures. United States v. Rogers, 659 F.3d 74, 77 (1st Cir. 2011) (quoting Miranda, 384 U.S. at 444). "Significant deprivation occurs in circumstances carrying a 'badge of intimidation,' or 'inherent compulsions,'" id. (quoting Miranda, 384 U.S. at 457, 467), "or as the Supreme Court later put it,

in circumstances that 'blur[] the line between voluntary and involuntary statements, and thus heighten[] the risk' that the Fifth Amendment privilege will not be appreciated," id. (quoting Dickerson, 530 U.S. at 435). Two objective tests are prescribed to assist in the task of differentiating between scenarios that would, or would not, be custodial in nature. Initially, courts consider "whether a reasonable person in the circumstances would have felt 'at liberty to terminate the interrogation and leave.'" Id. (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). If not, then the second inquiry is "whether those circumstances would have been likely to coerce a suspect to engage in back and forth with the police, as in the paradigm example of traditional questioning." Id. (quoting Berkemer v. McCarty, 468 U.S. 420, 436-37 (1984)).

Gamache does not make a serious argument that any of the three conversations with police officers occurred in a traditional custodial setting restricting his freedom of movement, nor could he. Each interview took place in Gamache's own apartment with officers who were nonconfrontational. Gamache was not arrested on any occasion nor was his physical freedom of movement restricted in any way. His argument is that his freedom of action was restricted by the type of psychological pressure described by the Court of Appeals in Rogers. In Rogers, the First Circuit held that a naval officer was subjected to custodial interrogation in his home when he was ordered by his commanding officer to report to his home, where law enforcement was waiting to question him. The Court observed that "the most significant element in analyzing the situation is that the military had made certain that Rogers did not walk into it voluntarily, or confront the police with free choice to be where he was." 659 F.3d at 78. The Rogers Court made it clear that the military command structure and the psychological pressure it placed on the officer were the driving forces behind its holding. Id. at 78-79. Gamache proposes that this court adopt a similar "narrow rule" under these "specialized facts" relating to protection from abuse orders and

made applicable to "surrendered contraband" and "any subsequent interrogation."  (Motion at 8.)

The dilemma confronting a citizen served with a temporary protection from abuse order signed by a judge and directing him to relinquish any firearms in his possession is not the same as the scenario set forth in Rogers.  There is no command structure that required Gamache to voluntarily allow the officers into his apartment or speak with them regarding firearms currently or formerly in his possession.  Had he elected to step outside the apartment, or remain on the sidewalk, the officers had no court order at their disposal which would have allowed them access to the apartment or required Gamache to answer their questions.  Even if Gamache had not consented to the officers' entry into his apartment, and had instead gone into his own apartment after being advised of the provisions of the orders, taken the weapon down from the wall, and brought it outside to the officers, saying nothing in the process, he could be in the same predicament he now finds himself.  Clearly there would be no violation of the Fourth Amendment or of Miranda on those facts, just as there was no violation on these facts, but Gamache's mere act of relinquishing the firearm in response to a court order could have led to criminal charges.

## Conclusion

Notwithstanding the lack of a Fourth Amendment violation or any violation of the Miranda ruling under the Fifth Amendment, Gamache is asking this court to adopt a rule of suppression that would prohibit the United States from using any evidence lawfully relinquished to state authorities pursuant to court orders under state laws.  If the point of suppression orders is to prevent arbitrary and oppressive interference by law enforcement officers, it makes no sense to enter an order of suppression on these facts.  The officers in this case followed the rules and court orders they were given.  Gamache was "compelled" by court process to relinquish the

firearms in his possession without any promise of immunity if one of those weapons turned out to be, for instance, the murder weapon in an unsolved crime, or indeed, an unregistered sawed-off shotgun.  But it does not follow that the officers forced their way into Gamache's premises, searched his premises, or seized evidence or obtained statements in violation of the Constitution.  Issues of sound public policy and fundamental fairness aside, Gamache's motion does not raise any constitutional basis for the suppression of either the firearm or the subsequent statements he made to law enforcement officers and accordingly I recommend that the court deny the motion.

                                    NOTICE

      A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

      Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

May 23, 2013                         /s/ Margaret J. Kravchuk
                                     U.S. Magistrate Judge